EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* PERFECTO RIVERA, acusado y apelante.

No. 4664.—*Sometido:* Febrero 3, 1932. *Resuelto:* Julio 29, 1932.

*Angel A. Vázquez,* abogado del apelante; *R. A. Gómez, Fiscal,* abogado de *El Pueblo,* apelado.

El Juez Presidente Señor del Toro, emitió la opinión del tribunal.

El Fiscal del Distrito de San Juan formuló una acusación contra Francisco Echavarry y Perfecto Rivera, en los siguientes términos:

"El fiscal formula acusación contra Francisco Echavarry y Perfecto Rivera, por un delito de Adulteración de Leche (misdemeanor) cometido de la manera siguiente: Los referidos acusados Francisco Echavarry y Perfecto Rivera, allá por el día 21 de agosto de 1930, y en San Juan, P. R., que forma parte del distrito judicial del mismo nombre, ilegal, voluntaria y maliciosamente, vendían, ofrecían y tenían en venta, y transportaban como buena, con el fin de dedicarla al consumo humano, leche de vaca, adulterada con agua.

"El referido acusado Perfecto Rivera antes de cometer el delito de Adulteración de Leche, del cual se le acusa en esta acusación, fué condenado por la Corte de Distrito de San Juan, P. R., a pagar una multa de $100.00 en 25 de septiembre de 1928, por un delito de adulteración de leche, y cuya multa pagó.''

Llamada la causa para juicio ambos acusados' alegaron ser inocentes. Practicadas las pruebas, la corte absolvió a Echavarry. Con respecto a Rivera su sentencia fué:

". . . . . y declara culpable a Perfecto Rivera, del delito de adulteración de leche y lo condena a sufrir la pena de seis meses de cárcel, al pago de $500.00, y la cancelación de cualquier certificado o licencia que tenga para la venta de leche; sin costas, por ser insolvente.''

No conforme Rivera, apeló. Señala en su alegato dos errores así:

"1. La sentencia es contraria a la ley y a la las pruebas, ya que no hay evidencia suficiente para condenar al acusado, ni del standard o grado legal que la leche debe contener para ser vendida de acuerdo con la ley.

"2. La sentencia es nula.

Examinemos el primero.

De la transcripción de la evidencia resulta que al comenzar el juicio dijo la defensa:

"Nosotros admitimos el informe del perito en cuanto a que la leche salió adulterada y queremos admitir que este acusado no es un reincidente sino que fué condenado anteriormente por un delito de adulteración de leche; el acusado admite que eso es cierto. . . . .

"Fiscal:—En otras palabras hace alegaciones de culpabilidad sobre reincidencia.

"Defensa:—Nosotros admitimos que él fué condenado, para los efectos del récord."

El fiscal no introdujo prueba sobre reincidencia ni sobre el resultado del análisis químico de la leche ocupada. Presentó dos testigos, Víctor M. Morales y José Fonfría. La declaración del primero, que es un inspector de sanidad, fué, en parte, como sigue:

"Q.—Qué sabe en este caso?. R.—En 21 de agosto de 1930, en Puerta de Tierra, municipalidad de San Juan y en la calle de Pelayo, en un puesto de leche propiedad de Francisco Echavarry, nos presentamos el inspector José Fonfría y yo a tomar una muestra de leche. Tomamos la muestra en tres botellas, le echamos cinco gotas de formol, las lacramos, sellamos, y rotulamos 'Perfecto Rivera'; las llevamos una al laboratorio, una a la oficina local de sanidad y otra que le dejamos al acusado.—P.—Para qué era ese puesto de leche?— R.—Para la venta.—P.—Cuántas puertas tenía ese puesto?—R.—Una puerta.—P.—Había gente comprando leche?—R.—Sí, señor.—P.— De dónde tomaron la muestra?—R.—De una lata de gas que tenía aproximadamente diez litros de leche.—P.—Quién despachaba la leche?—R.—Perfecto Rivera.—P.—De quién era ese puesto?—R.—De Francisco Echavarry.—P.—La licencia del puesto a nombre de quién estaba?—R. Francisco Echavarry.—Fiscal: Nada más.—Defensa: P. —Quién comproba allí?—R.—Una señora y dos o tres niños.—P.— Cómo se llamaba la señora?—R.—No sé, no le tomé el nombre.—P. Sabe qué cantidad de leche compraba?—R.—No recuerdo.—P.—Y los niños los vió comprando?—R.—Tampoco recuerdo.—P.—No sabe el nombre de los niños?—R.—No, señor.—P.—De dónde tomó usted la muestra?—R.—De una lata de gas.—P.—Es un recipiente?—R.—Sí, señor.—Defensa: Nada más."

Fonfría, otro inspector de sanidad, corroboró a Morales sobre el hecho de haber estado en el puesto y tomado las tres muestras de leche. Nada dijo sobre la venta de leche por parte del acusado. Nada se le preguntó sobre el particular.

La prueba de la defensa consistió en la declaración del acusado Rivera y en la de otros testigos que la corroboran. En parte dijo el acusado:

"P.—Explique al señor Juez lo que ocurrió ese día con los inspectores de sanidad y la leche.—R.—Ese día 21 de agosto, jueves por la mañana, como a las ocho de la mañana, estábamos en espera de la leche, que no había llegado y a la hora de la llegada de la leche llegó el señor Morales y el señor Fonfría y de la misma leche que se estaba midiendo al recibirla tomaron una nuestra.—P.— En ese momento en que se estaba recibiendo la leche se estaba vendiendo?—R.—No, señor.—P.—Se estaba ofreciendo en venta? R.— No, señor, estábamos midiéndola para ponerle el lactómetro para saber si estaba a buena prueba para ponerla a la venta."

Al pronunciar su sentencia, el juez de distrito se expresó así:

"Se ha demostrado en este caso por la prueba de cargo que el depósito estaba abierto al público estando frente de él el acusado Perfecto Rivera y que él vendió leche de una lata de gas, que resultó adulterada con agua.

"En el caso Ríos, 28 D.P.R. 770, el acusado fué absuelto porque allí la leche se tomó de unos porrones y hubo prueba tendente a demostrar que esos porrones estaban fuera del establecimiento y el acusado no quería que los transportaran dentro y que un policía mismo declaró que el acusado tenía en la acera de su depósito de leche unos porrones que obstruían el tránsito y que no quería trasladarlos al depósito hasta que fueran inspeccionados por la sanidad.

"Y también hubo prueba en cuanto se refiere a la declaración de la persona a quien el inspector dijo que se había vendido la leche y el propio inspector a repreguntas de la defensa dijo que él no sabía de dónde se había sacado la leche que se vendía a aquella persona. En esas circunstancias desde luego, que no había prueba para condenar pero en este caso se ha dicho que la leche se sacaba de la lata y que de allí se vendía y que era un establecimiento abierto al público para la venta de leche."

Creemos que en cuanto a la adulteración, la prueba es suficiente. La admisión del acusado fué hecha sin cualificaciones.

En cuanto a la transportación, no hay prueba. Sí la hay y resultó contradictoria en cuanto a las modalidades del delito: vender, ofrecer y tener en venta. ¿Fué el conflicto bien resuelto? Creemos que sí. Nada revela pasión, prejuicio o parcialidad, ni error manifiesto. ¿Es la prueba que queda suficiente? Habiendo creído la corte sentenciadora la del fiscal, no puede decirse que deje de demostrar que se trataba de un puesto para la venta de leche a cuyo cargo estaba el acusado, en el que existía leche adulterada para la venta y donde había gente comprando, siendo el acusado el que la despachaba, es decir, el que la vendía, de cuyos hechos se infiere el de que la venta lo era para el consumo humano.

■ Vemos el segundo error. Todo lo que sobre él dice el apelante en su alegato es:

"La nulidad de la sentencia en este caso la funda el acusado apelante, en lo siguiente:

"A él se le imputó el delito de vender, ofrecer, tener y transportar como buena leche de vaca adulterada con agua, con el fin de dedicarla al consumo humano, (pág. 1 transcript), pero la sentencia le declara culpable de adulteración de leche, pág. 3 transcript, que es cosa distinta. Este último delito no le fué imputado en la acusación a Perfecto Rivera y, por tanto, él ha sido condenado de un delito del cual no fué informado.

"En tales condiciones, el acusado estima que la sentencia es nula."

En el caso de *El Pueblo* v. *Bermúdez,* 35 D.P.R. 596, 597, esta corte dijo:

"Tampoco tiene razón el apelante en decir que la sentencia no expresa el delito por el cual ha sido condenado pues bien si es cierto que al terminarse el juicio la corte declaró culpable al acusado sin decir por cuál delito, en la sentencia obrante en el libro de minutas de la corte aparece que se le declaró culpable del delito de adulteración de la leche. Es cierto que tal declaración de culpabilidad es bastante general pero nosotros podemos corregir la sentencia para hacerla más específica y que declare al acusado culpable de tener para la venta leche de vaca adulterada. El Pueblo v. Álvarez, 21 D. P. R. 86; El Pueblo v. Trinidad, 24 D. P. R. 886, y El Pueblo v. Bauzá, 34 D. P. R. 440."

Bastaría esa cita para, aplicándola, concluir que no se trata de una sentencia nula, sino errónea, susceptible de ser corregida en apelación. Pero hay más.

Al adoptarse en 1902 el nuevo Código Penal, formando parte de su título XIV que trata de los "Delitos contra la salud y seguridad pública," existía el artículo 337 que declaraba constitutivo de delito menos grave el hecho de adulterar o diluir cualquier comestible . . . . con el fraudulento propósito de ofrecerlo, o hacer o permitir que se ofreciera en venta como puro o no diluído, o fraudulentamente vender, tener u ofrecer en venta dicho artículo como no adulterado.

Habiendo en consideración las repetidas adulteraciones de leche que tanto daño causaban a la salud de todas las personas en general y en particular a la de los niños, en 1909 la Legislatura enmendó el artículo 337 prescribiendo que en todos los casos en que la bebida adulterada fuere leche, se impusiera al culpable de la adulteración, tenencia para la venta o venta de dicha bebida penas de arresto de dos a seis meses, castigando fuertemente la reincidencia. La jurisdicción se confirió exclusivamente a las cortes de distrito.

No fué bastante la reforma para detener las infracciones. La prueba del propósito fraudulento dificultaba el castigo, y al año siguiente la Legislatura pasó una "Ley proveyendo lo necesario para castigar la adulteración de leche, ofrecerla o tenerla para la venta" en la que el *adulterare . . . . . con el fraudulento propósito de ofrecerla, . . . . . y el fraudulentamente vendiere, . . . . .* quedaron sustituídos por *adulterare . . . . . con la intención de ofrecerla* y por *toda persona que la vendiere . . . . .* Se bajó a un mes el mínimum de las primeras infracciones, pero se mantuvo la pena fijada para los reincidentes. Se mantuvo también la jurisdicción exclusiva en las cortes de distrito, y se fijó el medio de probar la adulteración o dilución.

En 1925 quedó derogada la ley de 1911, siendo sustituída por la No. 77, titulada ''Ley proveyendo lo necesario para castigar la adulteración de leche y para otros fines,'' que es la que rige en la actualidad. Su sección 1 comienza: ''Toda persona que adulterare o diluyere leche y toda persona que la vendiere, ofreciere o tuviere en venta, o que la transportare o almacenare con el fin de dedicarla al consumo humano, . . . . .''

Se rebajó aun más la pena fijada para las primeras infracciones, pero se conservó la señalada para los reincidentes, y se agregó el transporte o almacenaje con el fin de dedicarla al consumo humano. En el título de la ley se conservó únicamente la palabra *adulteración.*

¿Se trata de diferentes delitos, o de uno solo que puede cometerse de varios modos? Si lo primero, habría que corregir la sentencia; si lo segundo, ni siquiera sería ello necesario.

Abriendo el volumen segundo de Corpus Juris, lo primero que en su texto encontramos es un trabajo del Profesor Throckmorton de la Universidad de Indiana, sobre *''Adulteration.''* Se define primero. Luego se trata de las reglas estatutarias y seguidamente de la naturaleza y elementos del delito. De esta parte transcribimos lo que sigue:

''Es un delito del derecho común vender o suministrar en alguna otra forma efectos alimenticios adulterados que puedan ser nocivos a la salud, o mezclar ingredientes malsanos o nocivos con alimentos o bebidas destinados a alguna persona, ora fueran tales actos cometidos con malicia o por el mero deseo de lucro.

''La ley que rige los delitos de adulteración o de vender alimentos adulterados, en su mayor parte procede de estatutos que definen estos delitos. En muchos casos los estatutos prescriben una manera o modo de determinar si un artículo está adulterado, y si el artículo no llega al límite legal prescrito, deberá considerarse adulterado, aunque de hecho pueda ser agradable al paladar e inofensivo y quizá no contenga ingredientes extraños.

''Los estatutos se dirigen generalmente contra las ventas de artículos adulterados o contra su posesión con fines de venta, y de con-

formidad con algunos de los estatutos el uso a que ha de dedicarse el artículo es un elemento pertinente para determinar si la venta es ilegal.'' 2 C. J. 3, 4, 5.

La parte final del trabajo se titula: ''Procesos Criminales'' y de ella transcribimos:

''Las acusaciones criminales por adulterar alimentos como delito del derecho común se rigen por las reglas relativas a acusaciones por delitos en general del derecho común.

''Las acusaciones o denuncias por vender o poseer substancias adulteradas estando basadas en estatutos que definen el delito, serán consideradas como suficientes si siguen substancialmente las palabras del estatuto bajo el cual son redactadas y alegan todos los hechos y circunstancias necesarios para hacer que el acusado caiga dentro de los términos del estatuto que crea y define el delito.'' 2 C. J. 8, 9.

Las citas nos llevan a los tomos 12, 19 y 22 de Cyc. De ellos nos limitaremos a transcribir las dos que siguen:

''El acto de vender o de ofrecer a la venta es considerado en derecho como un solo delito y el mero hecho de que se alegue el delito en esa forma en la acusación no hará que ésta sea defectuosa o causa de duplicidad.'' 19 Cyc. 1100.

''Es una regla bien establecida de procedimiento criminal que cuando un delito puede ser cometido de varias maneras, la acusación puede en una sola narración imputar su comisión en una o más de las formas especificadas en el estatuto. De tal suerte, cuando el estatuto penal menciona varios actos disyuntivamente y prescribe que cualquiera de ellos constituirá el mismo delito y estará sujeto al mismo castigo, una acusación puede imputar uno de dichos actos o todos en forma conjuntiva como que constituyen un solo delito. O, como frecuentemente se expone la misma regla, cuando un estatuto hace que cualquiera de los distintos actos relacionados con el mismo delito general, que estén sujetos a la misma medida y clase de castigo, sean procesables separadamente como distintos delitos, cuando cada uno de ellos haya sido cometido por persona distinta y en diferentes ocasiones, ellos pueden, al ser cometidos por la misma persona en el mismo momento, ser alegados en una sola narración como constitutivos de un solo delito; y esto es así aunque no se use una partícula disyuntiva en el estatuto, sino una conjunción que tenga significado disyuntivo.'' 22 Cyc. 380, 381, 382.

Vese, pues, que bajo el título general de "adulteración" se tratan todas las modalidades del delito, habiéndolo hecho así la Legislatura de Puerto Rico en la ley que hoy rige la materia. La adulteración es la base. Por sí· misma sería quizá tiempo y dinero malamente perdidos y nada más. Cuando hecha se introduce la substancia adulterada en el comercio de los hombres, realizándose el engaño y el daño a la salud, es que surge en verdad el acto delictivo. Y siendo ello así, no vemos que constituya error el imputar en general el delito de "Adulteración de Leche" como hizo el fiscal en esta causa, aunque en el cuerpo de la denuncia lo que se diga es que se *vendió* . . . . . por el acusado leche de vaca adulterada, y el declararse al acusado culpable "del delito de adulteración de leche" bajo tal acusación.

En cuanto a la reincidencia, nada dice el apelante en su alegato, y habiéndose admitido que existía la anterior condena también por adulteración de leche, existe claramente.

*Debe confirmarse la sentencia recurrida.*

El Juez Asociado Señor Córdova Dávila no intervino.